,

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARYANN MUNOZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| 40-44 FOREST STREET, LLC, | ) |
| and | ) |
| SHERRI PERROTTA, | ) |
| and | ) |
| THOMAS J. PERROTTA, | ) |
| and | ) **1:22-cv-11079-GAO** |
| APM, LLC d/b/a | ) |
| ANDALUSIAN PROPERTY MANAGEMENT, | ) |
| and | ) |
| DAVID WEBSTER, | ) |
| APM, LLC | ) |
| and | ) |
| JODIE NATALONI, | ) |
| APM, LLC | ) |
| and | ) |
| HEIDI CONLON, CODE ENFORCEMENT OFFCER, | ) |
| METHUEN BOARD OF HEALTH | ) |
| and | ) |
| CITY OF METHUEN, MA | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S FIRST AMENDED COMPLAINT
and
## DEMAND FOR JURY TRIAL

### INTRODUCTION

Maryann Munoz ("Munoz" or "Plaintiff") and Juan Munoz (collectively the "Munozes") signed a lease (the "Lease") in either November or December 2011 to rent 42 Forest Street, Methuen, MA 01844 (the "Apartment") {one of four units in 40-44 Forest Street, Methuen, Massachusetts (the "Property")} for $995.00 per month from Thomas J.

,

Perrotta ("T. Perotta"). *See* Ex. 1, Lease. Munoz paid the last month's rent of $995.00 and a security deposit of $995.00. *See* Ex. 1, Lease. T. Perrotta never complied with multiple requirements of Mass. Gen. Laws ch. 186. Munoz suffers from multiple medical problems, including panic attacks and depression, chronic low back pain with lumbar radiculopathy, degenerative arthritis, and rheumatoid arthritis. Munoz is disabled and receiving Social Security Disability Income ("SSDI"). Munoz has a handicapped placard issued by the Commonwealth of Massachusetts due to her mobility limitations. Years ago, Munoz requested and received an accommodation from T. Perrotta to park alongside the house close to an exit from her apartment to limit the distance she would have to walk. For no apparent reason, Sherri Perotta ("S. Perotta"), currently a manager for 40-44 Forest Street, LLC ("Forest Street"), the current owner of the building containing Munoz' Apartment, told Munoz she could no longer park where she has been parking for nearly nine years and had to park at the other end of the building—a much longer distance to walk to her car. David Webster ("Webster"), a maintenance worker for property management company, APM, LLC, doing business as Andalusian Property Management, parked in Munoz parking space near the building in June 2020 and also told her she could not park there any longer. On June 16, 2020, Jodie Nataloni ("Nataloni"), also working for APM, LLC, told Munoz that she could no longer park near her exit door—that the space was going to be used for the maintenance worker and a possible dumpster. S. Perrotta had also ordered Munoz to take a cross off the lawn when S. Perrotta allowed other tenants to put secular signs on the lawn without objection. S. Perrotta also told Munoz' son he could not park at the Property and ordered a friend visiting Munoz to leave the Property. The Perrottas also discriminated and retaliated against Munoz when she tried to have an emotional support dog in the Apartment and when she sought RAFT funds to help pay her rent. Munoz complained to

,

MCAD about the discrimination and retaliation in more than one formal complaint (and in amendments to her complaint). Munoz then removed the case to Superior Court alleging, among other claims, multiple violations of Mass. Gen. Laws ch. 186, for disability and religion housing discrimination, for aiding and abetting disability discrimination, for retaliation in violation of Mass. Gen. Laws ch. 151B and The Fair Housing Act (42 U.S.C. § 3601 et seq.) as well as for violation of Mass. Gen. laws ch. 93A as follows:

## JURISDICTION AND VENUE

1.  The Massachusetts Superior Court Department of the Massachusetts Trial Court has jurisdiction for claims for damages greater than $50,000.00 pursuant to Mass. Gen. Laws ch. 212, § 3, and for equity pursuant to Mass. Gen. Laws ch. 212, § 4 and Mass. Gen. Laws ch. 214, §§ 1, 2, and 3.

2.  Accordingly, jurisdiction is provided by Mass. Gen. Laws ch. 212, § 3.

3.  Venue is appropriate Essex Superior Court because the Property is located in Methuen, Massachusetts which is part of Essex County, Massachusetts.

4.  Since there is no longer a federal statutory claim, there is no federal jurisdiction.

## PARTIES

5.  Maryann Munoz ("Munoz") is a natural person residing in Methuen, MA.

6.  40-44 Forest Street, LLC ("Forest Street") is a domestic Massachusetts for profit limited liability company.

7.  Forest Street has a principal place of business in Methuen, Massachusetts.

8.  Sherri Perrotta ("S. Perrotta") is a natural person residing in Methuen, MA.

9.  S. Perrotta is a manager of Forest Street.

10. Thomas J. Perrotta ("T. Perrotta") is a natural person residing in Methuen, MA.

11. T. Perrotta is a manager of Forest Street.

,

12. APM, LLC is a New Hampshire limited liability company.

13. APM, LLC has a principal place of business at 23 S. Broadway #1, Salem, NH 03079.

14. Andalusian Property Management ("Andalusian"), to information and belief, does business as APM, LLC.

15. Andalusian currently manages the Property.

16. David Webster ("Webster") is an individual residing, to information and belief, in Massachusetts.

17. To information and belief, Webster does maintenance for APM, LLC.

18. Jodie Nataloni ("Nataloni") is a natural person residing to information and belief, in Massachusetts.

19. To information and belief, Nataloni performs office work for APM, LLC.

20. Heidi Conlon ("Conlon") is a natural person residing to information and belief, in Massachusetts.

21. Conlon is a Code enforcement foe the Methuen Board of Health ("BoH").

22. City of Methuen, MA ("Methuen") is a City in Massachusetts.

## FACTS

23. On July 22, 1976, T. Perrotta and his former wife, Ann Marie Perrotta purchased 42 Forest Street, Methuen, MA 01844 (the "Property") from Andrew Andruchaw and Anne Andruchaw and recorded the deed at the Essex North District Registry of Deeds in Book 1287, Page 148. *See* Ex. 2, Andruchaw Deed.

24. On December 26, 1995, Ann Marie Perrotta conveyed her interest in the Property to T. Perrotta as part of a divorce property settlement stipulation and recorded the deed at the Essex North District Registry of Deeds in Book 4422, Page 79. *See* Ex. 3, T. Perrotta Deed.

,

25. On December 19, 2006, T. Perrotta conveyed the Property to Forest Street and recorded the deed at the Essex North District Registry of Deeds in Book 10579, Page 189. *See* Ex. 4, Forest Street Deed.

26. In November or December, 2011, Forest Street rented an apartment (the "Apartment") {one of four rental units in the Property} to Munoz and her husband, Juan Munoz (collectively the "Munozes") and their family with a one year lease (the "Lease"). *See* Ex. 1, Lease.

27. The rent for the Property was $995.00 per month. *See* Ex. 1, Lease.

28. Munoz paid the first month rent and has paid the rent due each month since December 2011. *See* Ex. 5, Munoz Affidavit.

29. Munoz paid a security deposit of $995.00. *See* Ex. 5, Munoz Affidavit.

30. Munoz paid a last month's rent of $995.00 *See* Ex. 5, Munoz Affidavit.

31. The Lease has been renewed for yearly terms from November 20, 2011 through 2013. *See* Ex. 5, Munoz Affidavit.

32. T. Perrotta never complied with the multiple requirements of Mass. Gen. Laws ch. 186.

33. Munoz suffers from multiple medical problems, including panic attacks and depression, chronic low back pain with lumbar radiculopathy, degenerative arthritis, and rheumatoid arthritis.

34. Munoz suffers from significant mobility limitations due to the multiple medical problems outlined above. *See* Ex. 6, Munoz' Medical Diagnoses.

35. Munoz is not able to walk long distances due to the multiple medical problems outlined above. *See* Ex. 7, Medical Letter.

'

36. Panic attacks, anxiety, depression, chronic low back pain with lumbar radiculopathy, degenerative arthritis, and rheumatoid arthritis are physical or mental impairments that substantially limit one or more major life activities.

37. Munoz' panic attacks, anxiety, depression, chronic low back pain with lumbar radiculopathy, degenerative arthritis, and rheumatoid arthritis depression are qualifying disabilities and handicaps affecting myriad life functions.

38. The Perrottas and Forest Street knew or should have known of Munoz' medical and psychological disabilities.

39. Munoz is disabled and receiving Social Security Disability Income ("SSDI").

40. Munoz has a handicapped placard issued by the Commonwealth of Massachusetts due to her mobility limitations.

41. Munoz has seen and still sees multiple medical providers for her mobility limitations.

42. The Defendants knew or should have known of Munoz' ongoing disability in 2011.

43. T. Perrotta, S. Perrotta, and Forest Street were all well aware of Munoz' disability.

44. When Munoz viewed the Property she did not look at the vacant second floor apartment because she knew climbing the stairs repeatedly throughout the day would not be possible due to her mobility disability.

45. Munoz also rejected the other first floor apartment that consisted of two floors.

46. Before she moved in or committed to the first floor rental, Munoz requested an accommodation to park alongside the house close to an exit from her Apartment to limit the distance she would have to walk.

47. The accommodation request was allowed and Munoz has been parking close to one of her exit doors for the past nine years.

'

48. In the spring or summer of 2012, T. Perrotta hired contractors to pour concrete for the repair of walkways around the Property.

49. Munoz's husband noticed that the contractors had extra cement after the repair work was completed.

50. Munoz's husband called T. Perrotta and asked if the workers could pour the left over concrete on the side of the house where Munoz regularly had parked her car for the approximate past year as a disability accommodation.

51. T. Perrotta agreed and the concrete was poured as a partial pad for Munoz's car.

52. The concrete from the sidewalk matches the concrete in Munoz's parking space.

53. The concrete from Munoz's parking space is weathered indicating that it has been in place for a long period of time.

54. In the summer of 2017, a family landscaper friend had left over crushed stone and asked Munoz if she could use it.

55. The Munozes asked T. Perrotta if he had any objections to having the crushed stone put on the area Munoz was using for her parking accommodation at no cost to him and he consented.

56. The crushed stone is weathered indicating that it has been in place for a long period of time.

57. In approximately 2018, Methuen repaved Forest Street and cut the granite curb to accommodate Munoz's disability accommodation parking space.

58. Methuen also had a macadam incline installed to further accommodate Munoz's disability parking space.

,

59. On or about April 23, 2020, S. Perrotta told Munoz to remove a religious cross sign that she had placed in the lawn but made no comments about secular signs other tenants had put on the lawn.

60. On or about May 26, 2020, and for no apparent reason, S. Perrotta left a message on Munoz' voicemail telling her "Hey Maryann, this is Sherri Perrotta calling. Calling to find out what two parking spots…well I know you are parking in the front but what spaces are your numbers, because the car that's in the front has to now go in the driveway. No more parking in the front." *See* Ex. 5, Munoz Affidavit.

61. Munoz would have difficulty walking the extra distance to any new parking space due to her disability.

62. David Webster ("Webster"), a maintenance worker for the current property management company, APM, LLC, doing business as Andalusian Property Management ("Andalusian"), parked in Munoz' parking space near the building in June 2020 and also told Munoz she could not park there any longer.

63. On June 16, 2020, Jodie Nataloni ("Nataloni"), working for APM, LLC, told Munoz that she could no longer park near her exit door—that the space was going to be used for the maintenance worker and a possible dumpster.

64. S. Perrotta also wanted to charge Munoz extra for her son's car when other tenants have had three cars and not been charged extra rent.

65. Furthermore, S. Perrotta wanted to charge Munoz extra rent since her son had turned 18 even though other tenants were not charged extra when their children became adults. *See* Ex. 8, Munoz Text 5-28-20.

66. The Lease allows Munoz, her husband and her children to reside in the apartment for one rent price. *See* Ex. 1, Lease.

,

67. On June 4, 2020, Suzanne Sandon, D.O. wrote Munoz a letter of disability and need for the parking accommodation.

68. On June 12, 2020, maintenance worker Webster, parked in Munoz' parking space near her exit door. *See* Ex. 5, Munoz Affidavit; Ex. 9, Alexzavior Munoz Letter 6-12-20.

69. Munoz told Webster that he was in her parking space. *See* Ex. 5, Munoz Affidavit.

70. Webster replied that it was no longer her place to park her car. *See* Ex. 5, Munoz Affidavit.

71. On June 16, 2020, Nataloni, working for APM, LLC, told Munoz that she could no longer park near her exit door—that the space was going to be used for the maintenance worker and a possible dumpster.

72. Munoz told Nataloni that she could not walk to the other parking spaces.

73. The Defendants violated sections 804(f)(1), 804(f)(2) as defined by 804(f)(3)(B) of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Act (the "Act") of 1988 (42 U.S.C. § 3601 et seq.). *See* The Fair Housing Act (42 U.S.C. § 3601 et seq.).

74. Pursuant to section 813 (42 U.S.C. § 3613) of the Act, the Defendants are subject to a private right of action by Munoz and liable for injunctive relief, compensatory damages, punitive damages, and attorneys' fees. *See* The Fair Housing Act (42 U.S.C. § 3601 et seq.).

75. Mass. Gen. Laws ch. 151B, § 1 mandates that "[t]he term 'housing or housing accommodations' includes any building, structure or portion thereof which is used or occupied or is intended, arranged or designed to be used or occupied, as the home, residence or sleeping place of one or more human beings." *See* Mass. Gen. Laws ch. 151B, § 1.

,

76. Mass. Gen. Laws ch. 151B, § 4(7) prohibits:

> For the owner, lessee, sublessee, real estate broker, assignee or managing agent of other covered housing accommodations or of land intended for the erection of any housing accommodation included under subsection 10, 11, 12, or 13 of section one, or other person having the right of ownership or possession or right to rent or lease or sell, or negotiate for the sale or lease of such land or accommodations, or any agent or employee of such a person or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or lease or otherwise to deny or withhold from any person or group of persons such accommodations or land because of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed forces, blindness, hearing impairment, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment or other handicap of such person or persons; (b) to discriminate against any person because of his race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed services, blindness, or hearing impairment or other handicap, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment in the terms, conditions or privileges of such accommodations or land or the acquisition thereof, or in the furnishing of facilities and services in the connection therewith or (c) to cause to be made any written or oral inquiry or record concerning the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, marital status, veteran status or membership in the armed services, blindness, hearing impairment or other handicap or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment, of the person seeking to rent or lease or buy any such accommodation or land; provided, however, that this subsection shall not apply to the leasing of a single apartment or flat in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence.

> *See* Mass. Gen. Laws ch. 151B, § 4.

77. Mass. Gen. Laws ch. 151B, § 4(7A) requires:

> For purposes of subsections 6 and 7 discrimination on the basis of handicap shall include but not be limited to:
> (1) a refusal to permit or to make, at the expense of the handicapped person, reasonable modification of existing premises occupied or to be occupied by such person if such modification is necessary to afford such person full

,

enjoyment of such premises; provided, however, that, in the case of publicly assisted housing, multiple dwelling housing consisting of ten or more units, or contiguously located housing consisting of ten or more units, reasonable modification shall be at the expense of the owner or other person having the right of ownership; provided, further, that, in the case of public ownership of such housing units the cost of such reasonable modification shall be subject to appropriation; and provided, further, that, in the case of a rental, the landlord may, where the modification to be paid for by the handicapped person will materially alter the marketability of the housing, condition permission for a modification on the tenant agreeing to restore or pay for the cost of restoring, the interior of the premises to the condition that existed prior to such modification, reasonable wear and tear excepted;

(2) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling; and

(3) discrimination against or a refusal to rent to a person because of such person's need for reasonable modification or accommodation.

Reasonable modification shall include, but not be limited to, making the housing accessible to mobility-impaired, hearing-impaired and sight-impaired persons including installing raised numbers which may be read by a sight-impaired person, installing a door bell which flashes a light for a hearing-impaired person, lowering a cabinet, ramping a front entrance of five or fewer vertical steps, widening a doorway, and installing a grab bar; provided, however, that for purposes of this subsection, the owner or other person having the right of ownership shall not be required to pay for ramping a front entrance of more than five steps or for installing a wheelchair lift.

Notwithstanding any other provisions of this subsection, an accommodation or modification which is paid for by the owner or other person having the right of ownership is not considered to be reasonable if it would impose an undue hardship upon the owner or other person having the right of ownership and shall therefore not be required. Factors to be considered shall include, but not be limited to, the nature and cost of the accommodation or modification needed, the extent to which the accommodation or modification would materially alter the marketability of the housing, the overall size of the housing business of the owner or other person having the right of ownership, including but not limited to, the number and type of housing units, size of budget and available assets, and the ability of the owner or other person having the right of ownership to recover the cost of the accommodation or modification through a federal tax deduction. Ten percent shall be the maximum number of units for which an owner or other person having the right of ownership shall be required to pay for a modification in order to make units fully accessible to persons using a wheelchair pursuant to the requirements of this subsection.

In the event a wheelchair accessible unit becomes or will become vacant, the owner or other person having the right of ownership shall give timely notice to a person who has, within the previous twelve months, notified the

'

owner or person having the right of ownership that such person is in need of a unit which is wheelchair accessible, and the owner or other person having the right of ownership shall give at least fifteen days notice of the vacancy to the Massachusetts rehabilitation commission, which shall maintain a central registry of accessible apartment housing under the provisions of section seventy-nine of chapter six. During such fifteen day notice period, the owner or other person having the right of ownership may lease or agree to lease the unit only if it is to be occupied by a person who is in need of wheelchair accessibility.

Notwithstanding any general or special law, by-law or ordinance to the contrary, there shall not be established or imposed a rent or other charge for such handicap-accessible housing which is higher than the rent or other charge for comparable nonaccessible housing of the owner or other person having the right of ownership.

*See* Mass. Gen. Laws ch. 151B, § 4.

78. Mass. Gen. Laws ch. 151B, § 4(11) prohibits discrimination of children in rental housing as follows:

For the owner, sublessees, real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other covered housing accommodations, or other person having the right of ownership or possession or right to rent or lease or sell such accommodations, or any agent or employee of such person or organization of unit owners in a condominium or housing cooperative, to refuse to rent or lease or sell or otherwise to deny to or withhold from any person such accommodations because such person has a child or children who shall occupy the premises with such person or to discriminate against any person in the terms, conditions, or privileges of such accommodations or the acquisition thereof, or in the furnishing of facilities and services in connection therewith, because such person has a child or children who occupy or shall occupy the premises with such person; provided, however, that nothing herein shall limit the applicability of any local, state, or federal restrictions regarding the maximum number of persons permitted to occupy a dwelling. When the commission or a court finds that discrimination in violation of this paragraph has occurred with respect to a residential premises containing dangerous levels of lead in paint, plaster, soil, or other accessible material, notification of such finding shall be sent to the director of the childhood lead poisoning prevention program.

*See* Mass. Gen. Laws ch. 151B, § 4.

79. Mass. Gen. Laws ch. 151B, § 5 prohibits "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts

,

forbidden under this chapter or to attempt to do so." *See* Mass. Gen. Laws ch. 151B, §
1; Mass. Gen. Laws ch. 151B, § 5.

80. The Defendants conspired, and aided and abetted one another to discriminate and
retaliate against Munoz by taking away the disability parking accommodation that
Munoz had enjoyed for years in violation of Mass. Gen. Laws ch. 151B.

81. The denial of the previously allowed accommodation totally disrupted Munoz'
enjoyment of her apartment and her freedom to come and go.

82. The reasonable accommodation is fully supported by multiple healthcare professionals.

83. Munoz was told, without any reasonable basis, that she could no longer have the
parking accommodation.

84. Munoz was shocked and placed in fear of not being able to come and go as she pleased
when the parking accommodation was taken away for no reason.

85. It was foreseeable that failing to continue the accommodation would cause Munoz
emotional distress.

86. The Defendants' failure to adhere to the requirements of 42 U.S.C. § 3601 et seq. and
Mass. Gen. Laws ch. 151B directly caused Munoz significant emotional distress.

87. The distress that Munoz endured due to the Defendants' failure to adhere to the
requirements of 42 U.S.C. § 3601 et seq. and Mass. Gen. Laws ch. 151B was of such
severity that no reasonable person should be expected to endure it.

88. Munoz has experienced agitation, increased alopecia from stress, increased neck and
back muscle spasms, increased pain and rheumatoid arthritis flare-ups, insomnia,
exacerbation of PTSD, worsened depressive feelings, tension, anxiety, and increased
joint pain and stiffness among other symptoms.

,

89. Mass. Gen. Laws ch. 186, § 15B(1)(b)(iii) provides that an owner may collect "a security deposit equal to the first month's rent provided that such security deposit is deposited as required by subsection (3) and that the tenant is given the statement of condition as required by subsection (2)…"

90. Forest Street took a security deposit of $995.00 from Munoz. *See* Ex. 1, Lease; Mass. Gen. Laws ch. 186, § 15B(1)(b)(iii).

91. Forest Street never "deposited" the security deposit as required or provided a "statement of condition" in violation of Mass. Gen. Laws ch. 186, § 15B(1)(b)(iii). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(1)(b)(iii).

92. Mass. Gen. Laws ch. 186, § 15B(1)(c) mandates that "[n]o lease or other rental agreement shall impose any interest or penalty for failure to pay rent until thirty days after such rent shall have been due." *See* Mass. Gen. Laws ch. 186, § 15B.

93. Forest Street's Lease  required Munoz to pay a $1.50 late fee for each day the rent was late in violation of Mass. Gen. Laws ch. 186, § 15B(1)(c). *See* Ex. 1, Lease; Mass. Gen. Laws ch. 186, § 15B.

94. Mass. Gen. Laws ch. 186, § 15B(1)(e) mandates that "[a] security deposit shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the lessor, and shall not be subject to the claims of any creditor of the lessor or of the lessor's successor in interest, including a foreclosing mortgagee or trustee in bankruptcy; provided, however, that the tenant shall be entitled to only such interest as is provided for in subsection (3)(b). *See* Mass. Gen. Laws ch. 186, § 15B(1)(e).

95. To information and belief, Forest Street never deposited the security deposit in an account free of "the claims of any creditor of the lessor" in violation of Mass. Gen.

,

Laws ch. 186, § 15B(1)(e). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(1)(b)(iii).

96. Mass. Gen. Laws ch. 186, § 15B(2)(a) mandates that

> Any lessor or his agent who receives, at or prior to the commencement of a tenancy, rent in advance for the last month of the tenancy from a tenant or prospective tenant shall give to such tenant or prospective tenant at the time of such advance payment a receipt indicating the amount of such rent, the date on which it was received, its intended application as rent for the last month of the tenancy, the name of the person receiving it and, in the case of an agent, the name of the lessor for whom the rent is received, and a description of the rented or leased premises, and a statement indicating that the tenant is entitled to interest on said rent payment at the rate of five per cent per year or other such lesser amount of interest as has been received from the bank where the deposit has been held payable in accordance with the provisions of this clause, and a statement indicating that the tenant should provide the lessor with a forwarding address at the termination of the tenancy indicating where such interest may be given or sent.

> Any lessor or his agent who receives said rent in advance for the last month of tenancy shall, beginning with the first day of tenancy, pay interest at the rate of five per cent per year or other such lesser amount of interest as has been received from the bank where the deposit has been held. Such interest shall be paid over to the tenant each year as provided in this clause; provided, however, that in the event that the tenancy is terminated before the anniversary date of such tenancy, the tenant shall receive all accrued interest within thirty days of such termination. Interest shall not accrue for the last month for which rent was paid in advance. At the end of each year of tenancy, such lessor shall give or send to the tenant from whom rent in advance was collected a statement which shall indicate the amount payable by such lessor to the tenant. The lessor shall at the same time give or send to such tenant the interest which is due or shall notify the tenant that he may deduct the interest from the next rental payment of such tenant. If, after thirty days from the end of each year of the tenancy, the tenant has not received said interest due or said notice to deduct the interest from the next rental payment, the tenant may deduct from his next rent payment the interest due.

> If the lessor fails to pay any interest to which the tenant is then entitled within thirty days after the termination of the tenancy, the tenant upon proof of the same in an action against the lessor shall be awarded damages in an amount equal to three times the amount of interest to which the tenant is entitled, together with court costs and reasonable attorneys' fees.

*See* Mass. Gen. Laws ch. 186, § 15B(2)(a).

,

97. Forest Street took a last month's rent of $995.00 from Munoz. *See* Ex. 1, Lease; Mass. Gen. Laws ch. 186, § 15B(2)(a).

98. Forest Street never provided Munoz with "a receipt indicating the amount of such rent" for the last month in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

99. Forest Street never provided Munoz with "a receipt indicating the … the date on which [the last month's rent] was received in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

100. Forest Street never provided Munoz with "a receipt indicating…its intended application as rent for the last month of the tenancy" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

101. Forest Street never provided Munoz with "a receipt indicating…the name of the person receiving [the last month's rent]" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

102. Forest Street never provided Munoz with "a receipt indicating…a description of the rented or leased premises" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

103. Forest Street never provided Munoz with "a receipt indicating…that the tenant is entitled to interest on said rent payment at the rate of five per cent per year or other such lesser amount of interest as has been received from the bank where the deposit has been held payable in accordance with the provisions of this clause" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

,

104. Forest Street never provided Munoz with "a receipt indicating…that the tenant should provide the lessor with a forwarding address at the termination of the tenancy indicating where such interest may be given or sent" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(a).

105. Mass. Gen. Laws ch. 186, § 15B(2)(b) mandates that:

> Any lessor or his agent who receives a security deposit from a tenant or prospective tenant shall give said tenant or prospective tenant at the time of receiving such security deposit a receipt indicating the amount of such security deposit, the name of the person receiving it and, in the case of an agent, the name of the lessor for whom such security deposit is received, the date on which it is received, and a description of the premises leased or rented. Said receipt shall be signed by the person receiving the security deposit.

> *See* Mass. Gen. Laws ch. 186, § 15B(2)(b).

106. Forest Street never provided Munoz with "a receipt indicating the amount of such security deposit in violation of Mass. Gen. Laws ch. 186, § 15B(2)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(b).

107. Forest Street never provided Munoz with "a receipt indicating… the name of the person receiving it" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(b).

108. Forest Street never provided Munoz with "a receipt indicating… the date on which it is received" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(b).

109. Forest Street never provided Munoz with "a receipt indicating… a description of the premises leased or rented" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(b).

,

110. Forest Street never provided Munoz with "a receipt… signed by the person receiving the security deposit" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(b).

111. Mass. Gen. Laws ch. 186, § 15B(2)(c) mandates that:

> Any lessor of residential real property, or his agent, who accepts a security deposit from a tenant or prospective tenant shall, upon receipt of such security deposit, or within ten days after commencement of the tenancy, whichever is later, furnish to such tenant or prospective tenant a separate written statement of the present condition of the premises to be leased or rented. Such written statement shall also contain a comprehensive listing of any damage then existing in the premises, including, but not limited to, any violations of the state sanitary or state building codes certified by a local board of health or building official or adjudicated by a court and then existing in the premises. Such statement shall be signed by the lessor or his agent and contain the following notice in twelve-point bold-face type at the top of the first page thereof:

> "This is a statement of the condition of the premises you have leased or rented. You should read it carefully in order to see if it is correct. If it is correct you must sign it. This will show that you agree that the list is correct and complete. If it is not correct, you must attach a separate signed list of any damage which you believe exists in the premises. This statement must be returned to the lessor or his agent within fifteen days after you receive this list or within fifteen days after you move in, whichever is later. If you do not return this list, within the specified time period, a court may later view your failure to return the list as your agreement that the list is complete and correct in any suit which you may bring to recover the security deposit."

> If the tenant submits to the lessor or his agent a separate list of damages, the lessor or his agent shall, within fifteen days of receiving said separate list, return a copy of said list to the tenant with either such lessor's signed agreement with the content thereof or a clear statement of disagreement attached.

> *See* Mass. Gen. Laws ch. 186, § 15B(2)(c).

112. Forest Street never provided Munoz with "a separate written statement of the present condition of the premises to be leased or rented" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(c). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(c).

,

113. Forest Street never provided Munoz with "a comprehensive listing of any damage then existing in the premises" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(c). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(c).

114. Forest Street never provided Munoz with "a separate written statement of the present condition of the premises to be leased or rented…signed by the lessor or his agent a comprehensive listing of any damage then existing in the premises" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(c). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(c).

115. Forest Street never provided Munoz with "a separate written statement of the present condition of the premises to be leased or rented… contain[ing] the following notice in twelve-point bold-face type at the top of the first page" in violation of Mass. Gen. Laws ch. 186, § 15B(2)(c). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(c).

116. Mass. Gen. Laws ch. 186, § 15B(2)(d) mandates that:

> Every lessor who accepts a security deposit shall maintain a record of all such security deposits received which contains the following information:—
>
> (i) a detailed description of any damage done to each of the dwelling units or premises for which a security deposit has been accepted, returned to any tenant thereof or for which the lessor has brought suit against any tenant;
>
> (ii) the date upon which the occupancy of the tenant or tenants charged with such damage was terminated; and
>
> (iii) whether repairs were performed to remedy such damage, the dates of said repairs, the cost thereof, and receipts therefor.
>
> Said record shall also include copies of any receipt or statement of condition given to a tenant or prospective tenant as required by this section.
>
> Said record shall be available for inspection upon request of a tenant or prospective tenant during normal business hours in the office of the lessor or his agent. Upon a wrongful failure by the lessor or his agent to make such record available for inspection by a tenant or prospective tenant, said tenant or prospective tenant shall be entitled to the immediate return of any amount paid in the form of a security deposit together with any interest which has accrued thereon.

,

> The lessor or his agent shall maintain said record for each dwelling unit or premises for which a security deposit was accepted for a period of two years from the date of termination of the tenancy or occupancy upon which the security deposit was conditioned.

*See* Mass. Gen. Laws ch. 186, § 15B(2)(d).

117. To information and belief, Forest Street does not maintain security deposit and damage records in violation of Mass. Gen. Laws ch. 186, § 15B(2)(d). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(2)(d).

118. Mass. Gen. Laws ch. 186, § 15B(3)(a) mandates that:

> (3) (a) Any security deposit received by such lessor shall be held in a separate, interest-bearing account in a bank, located within the commonwealth under such terms as will place such deposit beyond the claim of creditors of the lessor, including a foreclosing mortgagee or trustee in bankruptcy, and as will provide for its transfer to a subsequent owner of said property. A receipt shall be given to the tenant within thirty days after such deposit is received by the lessor which receipt shall indicate the name and location of the bank in which the security deposit has been deposited and the amount and account number of said deposit. Failure to comply with this paragraph shall entitle the tenant to immediate return of the security deposit.

*See* Mass. Gen. Laws ch. 186, § 15B(3)(a).

119. Forest Street never provided Munoz with "a receipt… indicat[ing] the name and location of the bank in which the security deposit has been deposited" in violation of Mass. Gen. Laws ch. 186, § 15B(3)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(a).

120. Forest Street never provided Munoz with "a receipt… indicat[ing] the…amount…of said deposit" in violation of Mass. Gen. Laws ch. 186, § 15B(3)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(a).

121. Forest Street never provided Munoz with "a receipt… indicat[ing] the…account number …of said deposit" in violation of Mass. Gen. Laws ch. 186, § 15B(3)(a). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(a).

,

122. Mass. Gen. Laws ch. 186, § 15B(3)(b) mandates that:

> A lessor of residential real property who holds a security deposit pursuant to this section for a period of one year or longer from the commencement of the term of the tenancy shall, beginning with the first day of the tenancy, pay interest at the rate of five per cent per year, or other such lesser amount of interest as has been received from the bank where the deposit has been held payable to the tenant at the end of each year of the tenancy. Such interest shall be paid over to the tenant each year as provided in this clause, provided, however, that in the event that the tenancy is terminated before the anniversary date of the tenancy, the tenant shall receive all accrued interest within thirty days of such termination. Such interest shall be beyond the claims of such lessor, except as provided for in this section. At the end of each year of a tenancy, such lessor shall give or send to the tenant from whom a security deposit has been received a statement which shall indicate the name and address of the bank in which the security deposit has been placed, the amount of the deposit, the account number, and the amount of interest payable by such lessor to the tenant. The lessor shall at the same time give or send to each such tenant the interest which is due or shall include with the statement required by this clause a notification that the tenant may deduct the interest from the tenant's next rental payment. If, after thirty days from the end of each year of the tenancy, the tenant has not received such notice or payment, the tenant may deduct from his next rent payment the interest due.

*See* Mass. Gen. Laws ch. 186, § 15B(3)(b).

123. Forest Street never provided Munoz with the interest in her security deposit in 2012 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

124. Forest Street never provided Munoz with the interest in her security deposit in 2013 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

125. Forest Street never provided Munoz with the interest in her security deposit in 2014 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

,

126. Forest Street never provided Munoz with the interest in her security deposit in 2015 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

127. Forest Street never provided Munoz with the interest in her security deposit in 2016 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

128. Forest Street never provided Munoz with the interest in her security deposit in 2017 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

129. Forest Street never provided Munoz with the interest in her security deposit in 2018 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

130. Forest Street never provided Munoz with the interest in her security deposit in 2019 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

131. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2012 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

132. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2013 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

,

133. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2014 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

134. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2015 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

135. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2016 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

136. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2017 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

137. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2018 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

138. Forest Street never provided Munoz with a statement "which shall indicate the name and address of the bank in which the security deposit has been placed" in 2019 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

,

139. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2012 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

140. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2013 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

141. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2014 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

142. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2015 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

143. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2016 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

144. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2017 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

145. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2018 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

146. Forest Street never provided Munoz with a statement "which shall indicate the… amount of the…security deposit" in 2019 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

,

147.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2012 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

148.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2013 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

149.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2014 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

150.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2015 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

151.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2016 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

152.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2017 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

153.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2018 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

154.  Forest Street never provided Munoz with a statement "which shall indicate the… account number of the…security deposit" in 2019 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

,

155. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2012 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

156. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2013 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

157. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2014 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

158. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2015 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

159. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2016 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

160. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2017 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

,

161. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2018 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

162. Forest Street never provided Munoz with a statement "which shall indicate the… amount of interest payable by such lessor to the tenant" in 2019 in violation of Mass. Gen. Laws ch. 186, § 15B(3)(b). *See* Ex. 5, Munoz Affidavit; Mass. Gen. Laws ch. 186, § 15B(3)(b).

163. Mass. Gen. Laws ch. 186, § 15B(6) mandates that: "[t]he lessor shall forfeit his right to retain any portion of the security deposit for any reason, or, in any action by a tenant to recover a security deposit, to counterclaim for any damage to the premises if he:

   (a) fails to deposit such funds in an account as required by subsection (3).  *See* Mass. Gen. Laws ch. 186, § 15B(6).

164. Forest Street never made the required deposit of the security deposit when it was paid.

165. Forest Street never made the required deposit of the security deposit at any time after it was paid.

166. In July 2020, Munoz was told by CTI that the security deposit belonged to her.

167. Forest Street forfeited its right to Munoz' security deposit.

168. Mass. Gen. Laws ch. 186, § 15B(7) mandates that:

> If the lessor or his agent fails to comply with clauses (a), (d), or (e) of subsection 6, the tenant shall be awarded damages in an amount equal to three times the amount of such security deposit or balance thereof to which the tenant is entitled plus interest at the rate of five per cent from the date when such payment became due, together with court costs and reasonable attorney's fees.

> *See* Mass. Gen. Laws ch. 186, § 15B(7).

169. Munoz is entitled to triple her security deposit plus interest as damages.

,

170. 940 Code Mass. Reg 3.17 outlines what is considered an unfair business practice in rental housing. *See* Ex. 940 Code Mass. Reg 3.17.

171. By violating Mass. Gen. Laws ch. 186 and including unlawful provisions in the Lease, Forest Street and its managers committed unfair business practices.

172. Munoz was harassed repeatedly by the Defendants.

173. Munoz applied for and, on June 10, 2020, received an Harassment Prevention Order ("HPO") against S. Perrotta.

174. On June 17, 2020, the Defendants were served a Mass. Gen. Laws ch. 93A Demand Letter. *See* Mass. Gen. Laws ch. 93A Demand Letter.

175. After an evidentiary hearing, the HPO was not extended.

176. On July 1, 2020, Munoz was rushed to the hospital with cardiac problems and suffered arrhythmias and increased anxiety from the stress.

177. Munoz has needed counseling due to the stress and depression from the Defendants' actions.

178. The Defendants responded to the Mass. Gen. Laws ch. 93A Demand Letters but without any reasonable offers of settlement.

179. On August 3, 2020 at approximately 11:15 A.M., Nataloni and a maintenance worker walked in to Munoz's Apartment without knocking and when challenged for the intrusion claimed they were in the wrong apartment.

180. Munoz filed MCAD Complaints for discrimination and retaliation as well as amended the MCAD Complaint multiple times and removed the cases to Superior Court.

181. During the period of time since the MCAD Complaint was filed, Munoz has been harassed by the Perrottas to the point that her anxiety and stress significantly increased requiring increased counseling therapy.

,

182. Munoz was advised to obtain an ESA dog by her counselor.

183. Munoz obtained a puppy that she could train for her emotional support.

184. She gave the letter from her counselor to T. Perrotta and the Perrottas and Forest Street allowed the ESA dog as a disability accommodation. *See* Ex. 10, Affidavit T. Perrotta.

185. After allowing the disability accommodation, the Perrottas and Forest Street, through their counsel, demanded that Munoz sign a Proposed Lease Pet Addendum. See Ex. 11, Proposed Lease Pet Addendum.

186. Munoz felt multiple terms of the demanded Lease Pet Addendum were unlawful and placed her ESA dog at risk of being seized for no reason and at her expense.

187. Munoz's reasonable accommodation request to have an ESA was indisputably allowed. *See* Ex. 10, Affidavit T. Perrotta.

188. Since the accommodation was allowed, there was no need for an interactive process to review the already allowed accommodation.

189. The Proposed Lease Pet Addendum contains multiple requirements, some of which could not be met at the time and some of which were unlawful attempts to hinder Munoz' exercise of her rights under Mass. Gen. Laws ch. 151B. *See* Ex. 11, Proposed Lease Pet Addendum.

190. T. Perrotta, for whom the Proposed Lease Pet Addendum was supposed to be signed, stated under the "pains and penalties of perjury" that without the signed Proposed Lease Pet Addendum "our other tenants will be at risk." *See* Ex. 10, Affidavit T. Perrotta at ¶ 7; *See* Ex. 11, Proposed Lease Pet Addendum.

191. Only about four of the thirteen required paragraphs of the Proposed Lease Pet Addendum have anything to do with any conceivable risk to "other tenants." *See* Ex. 11, Proposed Lease Pet Addendum.

,

192. Specifically, ¶ 1 demanded that Munoz "not allow the dog into any of the indoor common areas of the property." Since the Plaintiff's apartment exits to the outside from both doors, there would be no need to be on the common property but the restriction from common property was unreasonable if she were visiting a neighbor and had nothing to do with "risk" to any other tenant. *See* Ex. 11, Proposed Lease Pet Addendum.

193. ¶ 2 barred Munoz from giving "the pets baths in the shower, bathtub, or sinks of the Premises and [the tenant] shall be responsible any costs associated with the clogging of any such shower, bathtub, or sink due to animal hair." The mandate not to bathe the dog is unreasonable and could be done using a hair or fur trap in the fixture outflow. *See* Ex. 11, Proposed Lease Pet Addendum.

194. ¶ 3 required Munoz "[t]o pay for a professional deep cleaning of the Premises to remove all animal hair prior to the Tenant vacating the Premises" and was unreasonable since cleaning is a landlord responsibility. *See* Ex. 11, Proposed Lease Pet Addendum.

195. ¶ 4 required Munoz "[t]o provide, on an annual basis, written verification from a veterinarian that the pet is in good health, is free of distemper, rabies, ticks and fleas (if applicable), current on all necessary shots and vaccines and spayed or neutered if dog or cat is at least six (6) months of age." There was no lawful reason to require Munoz to spay or neuter her animal. In addition, if the animal developed an illness—cancer, diabetes, arthritis or a myriad of other diseases--it is none of Perrotta's business and he would have no lawful right to order the animal removed from Munoz' apartment. *See* Ex. 11, Proposed Lease Pet Addendum.

196. ¶ 5 mandated that Munoz "provide, on an annual basis, written verification that the pet has been registered or licensed with the town of Methuen, (if applicable)" but licensing

is already a Methuen requirement that needed no Proposed Lease Pet Addendum. *See* Ex. 11, Proposed Lease Pet Addendum; Ex. 12, Methuen Dog Ordinances.

197. ¶ 6 required Munoz "[t]o have the dog wear a collar and tags with identification at all times" and reflected Perrotta and his counsel's lack of understanding of dogs, Methuen dog ordinances and dog immunizations/inoculations. The dog could not get a license without a rabies inoculation and the inoculation could not be done until at least three-four months of age and the licensing was not required until six months of age. *See* Ex. 11, Proposed Lease Pet Addendum; Ex. 12, Methuen Dog Ordinances; Ex. 13, CDC Guide on Rabies Inoculations.

198. ¶ 7 required Munoz "[t]o not allow the pet to urinate or defecate in any unit and/or common area of the property in which the Premises is located and to immediately clean up, bag and properly dispose of any excrement deposited by the pet on or near the property." Given that the pet was a puppy, accidents are likely to happen and would be cleaned up by Munoz and for which she would be responsible as a tenant. It should not be grounds for an eviction. *See* Ex. 11, Proposed Lease Pet Addendum.

199. ¶ 8 required Munoz "[t]o not allow the pet to cause any disturbance, nuisance or any other action which interferes with the quiet enjoyment of other residents or the health, welfare or safety of any agent or contractor hired by the Landlord or any other person lawfully on or near the property in which the Premises is located. Such prohibited behavior may include the following, without limitation:

a. making excessive noise;

b. causing damage to the unit and/or property grounds; and

c. lunging at or attacking any human or other animal;."

,

If another tenant is disturbed by an occasional bark is no reason to evict Munoz. *See* Ex. 11, Proposed Lease Pet Addendum.

200.  ¶ 9 maked Munoz "responsible for all damage or destruction caused by the pet to the Premises or any of the common areas at the property and to pay, within thirty (30) days of the receipt of an invoice from the Landlord, the costs of any repair caused by such damage or destruction" seemed partially reasonable since a tenant is responsible for damage caused by the tenant's family including any pets or ESA animals. However, to mandate payment within 30 days without any evidence that what is alleged in the common area was caused by Munoz' ESA was unreasonable. *See* Ex. 11, Proposed Lease Pet Addendum.

201.  ¶ 10 mandated that Munoz "not allow, keep and/or maintain any other pet(s), even on a temporary basis, in the Premises and/or on the property grounds without the prior written consent of the Landlord" was an apparent attempt not to allow any other ESA or service animal by an unlawfully mandated agreement. *See* Ex. 11, Proposed Lease Pet Addendum.

202.  ¶ 11 was vague and without any justification mandated "[t]o allow the Landlord or its agents to contact an emergency contact person, to have him or her remove the pet from the Premises and/or in the event the emergency contact person is unwilling or unable to remove the pet, to allow the Landlord to have the pet removed by the city animal control officer. The Tenant further agrees to be responsible for all fees and costs associated with such removal, including, but not limited to, any fines or charges imposed by the city and/or kennel fees and to absolve the management company for any and all liability for actions taken on behalf of the pet owner for the wellbeing of the pet." The provision had no legal basis and would open Munoz to unlimited liability

'

and allow seizure of the ESA without any reason or cause. *See* Ex. 11, Proposed Lease Pet Addendum.

203.  ¶ 12 declared that Munoz would "be responsible for all costs and damages caused by the Tenant's failure to abide by this Agreement, including, but not limited to, reasonable attorney fees and court costs" and subjected Munoz to unlimited liability without her or her ESA having done anything to damage the Perrottas' property or having violated any ordinance or statute. *See* Ex. 2, Proposed Lease Pet Addendum.

204.  ¶ 13 would absurdly have required Munoz "to indemnify the Landlord for any claims from any third party that result from the Tenant's pets as well as from any violation of any of the above provisions of this Addendum, including but not limited to payment of any resulting damages, costs, and attorney's fees" when the Perrottas should be responsible for their own liabilities and not make Munoz pay their legal fees for violating a Proposed Lease Pet Addendum that contained unreasonable, illogical and unlawful mandates. *See* Ex. 11, Proposed Lease Pet Addendum.

205.  All that the Proposed Lease Pet Addendum did was to impede Munoz' right to enjoy a housing accommodation that the Perrottas and Forest Street had already allowed. It was an attempt to force Munoz to comply with unreasonable, illogical and unlawful mandates or give up her allowed disability accommodation. The unlawful mandates that were in part impossible to comply with and were associated with potentially unlimited costs were designed to interfere with and block Munoz' right to enjoy her accommodation. *See* Ex. 11, Proposed Lease Pet Addendum.

206.  In further support of the retaliatory nature of the Proposed Lease Pet Addendum and the obvious effort to find an excuse to evict Munoz for exercising her right to have an ESA, the enforcement provision stated that "[a]ny violation by the Tenant of any of the

,

above provisions shall be considered a violation of the lease into which this Addendum is incorporated and may result in a termination of the Tenant's tenancy." *See* Ex. 11, Proposed Lease Pet Addendum.

207. After allowing the ESA accommodation, the Perrottas and Forest Street conspired and aided and abetted one another to retaliate and discriminate against Munoz by deliberately and willfully trying to force her to give up the ESA or face potentially unlimited liability and expense and unlawful seizure of her ESA dog by signing the Proposed Lease Pet Addendum.

208. The Perrottas and Forest Street have again retaliated against Munoz for filing the first MCAD Complaint and subsequent Superior Court lawsuit.

209. In further retaliation against Munoz, the Perrottas and Forest Street then sought a preliminary injunction to try to force Munoz to comply with the unlawful, discriminatory and retaliatory Proposed Lease Pet Addendum. *See* Ex. 11, Proposed Lease Pet Addendum.

210. As more retaliation, the Perrottas and Forest Street raised the rent during the process of the litigation by approximately 27% as retaliation for filing the original MCAD Complaint and to try to force Munoz to move.

211. As even more retaliation, the Perrottas and Forest Street installed cameras on the property that looked directly into Muniz' bedroom and living room windows.

212. Munoz took a picture of the cameras from inside both her bedroom and living room to verify the direction of view of the cameras.

213. That camera surveillance invaded Munoz' privacy, was designed to harass her, invade her right to privacy in her apartment and bedroom and to force her to move in retaliation for filing the initial MCAD Complaint.

,

214. Sometime in the late summer of fall of 2020, the Perrottas had a small roof protecting the unpainted porch surface in front of an entry door.

215. In additional retaliation, the Perrottas and Forest Street removed the overhang roof area and failed to replace it causing water and ice to accumulate on the porch area.

216. On or about October 31, 2020, during or shortly after a rain when the unpainted porch floor became slippery, Munoz' visiting nurse slipped and fell on that porch floor.

217. On about November 2, 2020, Munoz first phoned Alicia Bisesti, the head clerk of the Methuen Health Division, about the ice, rain and dangerous fall conditions of the porch floor

218. Munoz phoned again on November 4, 2020 to inquire if an inspector had been assigned to investigate the dangerous conditions of the porch and the inflow of rainwater into her apartment.

219. Bisesti indicated to Munoz that she was not the only person on a list to assign an inspector to.

220. Munoz phoned Bisesti again November 23, 2020 asking Bisesti for any information regarding replacement of the porch roof to prevent further falls and to control the rainwater that entered the apartment

221. Munoz explained to Bisesti that her visiting nurse was not able to access that entry door that day because of the pouring rain off the roof and the dangerous porch floor conditions.

222. Bisesti gave Munoz the name of Heidi Conlon ("Conlon"), and said that she would have Conlon call her.

223. Within about ten minutes, Conlon called with an aggressive rude tone explaining to Munoz that the Perrottas were not required to replace the roof or put up rain gutters and

,

ignored the Massachusetts Sanitary Code requiring windows and doors to keep rain water out of a dwelling.

224.  Conlon also falsely stated that the Perrottas did not come by the Property to look at the porch because Munoz had a restraining order against them.

225.  Munoz did not have a restraining order against the Perrottas.

226.  Munoz corrected Conlon's misimpression or misinformation.

227.  Conlon then told Munoz that there was nothing she could do to compel the Perrottas to rebuild a roof where it was not required and ended the conversation.

228.  Conlon then called back within about sixteen minutes with a very heightened tone and would not let Munoz speak.

229.  Conlon told Munoz to "listen to me," made reference to Munoz' lawsuit against the Perrottas and others and told Munoz to stop calling the Board of health.

230.  Conlon falsely accused Munoz of refusing to allow a contractor to replace a storm door, which was blatantly untrue.

231.  In actuality, a contractor had arrived at the Munoz residence on or about November 5, 2020 to take measurement and left with no further communication.

232.  Conlon rudely yelled at Munoz to which Conlon unprofessionally responded that she was just making sure Munoz heard her.

233.  When Munoz told Conlon that her nurse could hear Conlon's yelling, Conlon hung up.

234.  The Perrottas took down and failed to replace the porch roof to retaliate against Munoz for filing her initial and subsequent MCAD Complaints and to make it uncomfortable for Munoz to remain in the apartment and to constructively evict her.

,

235. Conlon has refused to inspect the dangerous porch conditions and has unlawfully aided and abetted the Perrottas in their discrimination and retaliation and failed to perform her duty as a code enforcement officer for the Methuen BoH.

236. To date, Conlon failed to perform her job and inspect the water leakage into Munoz' apartment.

237. The Methuen BOH has failed to ensure that resident complaints are properly answered and inspected.

238. By their failure to ensure that Conlon performs her job, the Methuen BoH has aided and abetted the Perrottas to discriminate and retaliate against Munoz.

239. Munoz told Nataloni from APM, LLC that her refrigerator was malfunctioning and leaking water into the refrigerator compartment.

240. Nataloni came to the Apartment and measured the refrigerator.

241. On November 18, 2020, a maintenance worker delivered a replacement refrigerator that was dented, rusted and smaller than the one that was in Munoz' apartment.

242. The Perrottas and Forest Street substituted a used, damaged and smaller refrigerator in Munoz Apartment to retaliate against her for filing the MCAD Complaints.

243. Munoz told Nataloni that the freezer door would not stay shut and that she would have to dispose of food that did not fit into the smaller used and damaged unit.

244. Nataloni agreed to speak with the Perrottas.

245. Counsel for the Perrottas and Forest Street subsequently indicated that the Perrottas would purchase a new refrigerator of similar size to the one that was removed.

246.  Munoz was told the new refrigerator would be delivered Friday, November 20, 2020 between 8 A.M. and 12 P.M.

247.  As of 6 P.M. that Friday, no refrigerator had been delivered.

248. Munoz had to dispose of about $60 worth of food that spoiled.

249. The Perrottas and Forest Street continued to harass and retaliate against Munoz for exercising her rights under Mass. Gen. Laws ch. 151B.

250. When Munoz had difficulty paying her rent she sought financial assistance from the Commonwealth through RAFT.

251. The Perrottas refused to cooperate with RAFT in further discrimination and retaliation against Munoz for filing the MCAD Complaints.

252. All the Munoz' rent (and possibly more than her owed rent) was ultimately paid by RAFT.

253. Munoz never received a return of her security deposit (or any letter indicating why it had been withheld) within thirty days of her vacating the Apartment.

**COUNT 1**
**DISABILITY DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CH. 151B, §§ 4(4), 4(4)(A), 4(5), 4(7), 4(7A), 4(11)**

254. The Plaintiff repeats and re-alleges ¶¶ 1-253 as if they were repeated herein.

255. The Defendants discriminated against the Plaintiff on the basis of disability and religion by telling her she can no longer park near her exit door, by interfering with her ESA, by raising her rent, by refusing to cooperate with RAFT, by pointing cameras into her bedroom and living room, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling her that she must remove her religious cross from the lawn but other tenants could keep their secular signs on the lawn.

256. The Defendants interfered with the Plaintiff's exercise of her rights under Mass. Gen. Laws ch. 151B to continue her previously allowed disability accommodation to park near her exit door and to have an ESA.

,

257. The Defendants aided and abetted one another by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment and by interfering with Munoz' ESA.

258. The Defendants retaliated against the Plaintiff by rescinding her parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment and by interfering with Munoz' ESA.

259. WHEREFORE, the Plaintiff prays this Honorable Court will order:

    a. Judgment for the Plaintiff on Count 1;

    b. An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

    c. Annual anti-discrimination training for all Defendants;

    d. Allowance of her parking accommodation;

    e. Allowance of her lawn cross;

    f. Free rent;

    g. Triple damages;

    h. Emotional damages;

    i. Counsel fees and costs;

    j. Punitive damages.

    k. Interest

    l. Such additional orders as this Honorable Court may deem fair and just.

**COUNT 2**
**RETALIATION IN VIOLATION OF MASS. GEN. LAWS CH. 151B, §§ 4(4),**
**4(4)(A), 4(5), 4(6), 4(7), 4(7A), 4(11)**

,

260. The Plaintiff repeats and re-alleges ¶¶ 1-259 as if they were repeated herein.

261. The Defendants retaliated against the Plaintiff for attempting to exercise her rights pursuant to Mass. Gen. Laws ch. 151B to continue her previously allowed disability parking accommodation and to continue the placement of her religious cross on the lawn.

262. The Defendants aided and abetted one another by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment and by interfering with Munoz' ESA.

263. The Defendants retaliated against the Plaintiff by rescinding her parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment and by interfering with Munoz' ESA.

264. The Defendants ordered Munoz' son and his friend off the Property when they were visiting Munoz

265. WHEREFORE, the Plaintiff prays this Honorable Court will order:

   a. Judgment for the Plaintiff on Count 2;

   b. An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

   c. Annual anti-discrimination training for all Defendants;

   d. Allowance of her parking accommodation;

   e. Allowance of her lawn cross;

   f. Free rent;

   g. Triple damages;

,

    h.  Emotional damages;

    i.  Counsel fees and costs;

    j.  Punitive damages.

    k.  Interest

    l.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT 3
## BREACH OF CONTRACT

266. The Plaintiff repeats and re-alleges ¶¶ 1-265 above and incorporates them herein by reference.

267. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

268. The Plaintiff paid her rent as her part of the contract and abided by the other Lease provisions.

269. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq.* and discriminated and retaliated against Munoz by rescinding her parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment and by interfering with Munoz' ESA and by telling her that she must remove her religious cross from the lawn.

270. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 186.

271. The Defendants breached the Plaintiff's Lease by violating Mass. Gen. Laws ch. 151B, Mass. Gn. Laws ch. 186, and 42 U.S.C. § 3604, *et seq.*

,

272. As a direct legal result of that breach of the Plaintiff's Lease by the Defendants, the Plaintiff sustained multiple damages as outlined *supra*.

273. WHEREFORE, the Plaintiff prays this Honorable Court will order:

    a.  Judgment for the Plaintiff on Count 4;

    b.  An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

    c.  Annual anti-discrimination training for all Defendants;

    d.  Allowance of her parking accommodation;

    e.  Allowance of her lawn cross;

    f.  An injunction barring the Defendants from violating Mass. Gen. Laws ch. 186 in the future;

    g.  Free rent;

    h.  Triple damages;

    i.  Emotional damages;

    j.  Counsel fees and costs;

    k.  Punitive damages.

    l.  Interest

    m.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT 4
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

274. The Plaintiff repeats and re-alleges ¶¶ 1-273 above and incorporates them herein by reference.

275. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

,

276. The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

277. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq*. and discriminated and retaliated against Munoz) by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

278. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 186.

279. By breaching the Plaintiffs' Lease, the Defendants breached the covenant of good faith and fair dealing that is inherent in all Massachusetts contracts.

280. As a direct legal result of that breach of the covenant of good faith and fair dealing by the Defendants, the Plaintiff sustained multiple damages as outlined *supra*.

281. WHEREFORE, the Plaintiff prays this Honorable Court will order:

   a. Judgment for the Plaintiff on Count 5;

   b. An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

   c. Annual anti-discrimination training for all Defendants;

   d. Allowance of her parking accommodation;

   e. Allowance of her lawn cross;

   f. An injunction barring the Defendants from violating Mass. Gen. Laws ch. 186 in the future;

,

g.  Free rent;

h.  Triple damages;

i.  Emotional damages;

j.  Counsel fees and costs;

k.  Punitive damages.

l.  Interest

m.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT 5
## BREACH OF THE COVENANT OF QUIET ENJOYMENT

282.  The Plaintiff repeats and re-alleges ¶¶ 1-281 above and incorporates them herein by reference.

283.  The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

284.  The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

285.  The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq.* and discriminated and retaliated against Munoz) by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

286.  The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 186.

,

287. The Defendants breached the covenant of quiet enjoyment by not adhering to the mandates of Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186 or 42 U.S.C. § 3604, *et seq*. and by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

288. As a direct legal result of that breach of the covenant of quiet enjoyment by the Defendants, the Plaintiff sustained multiple damages as outlined *supra*.

289. WHEREFORE, the Plaintiff prays this Honorable Court will order:

   a.  Judgment for the Plaintiff on Count 6;

   b.  An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

   c.  Annual anti-discrimination training for all Defendants;

   d.  Allowance of her parking accommodation;

   e.  Allowance of her lawn cross;

   f.  An injunction barring the Defendants from violating Mass. Gen. Laws ch. 186 in the future;

   g.  Free rent;

   h.  Triple damages;

   i.  Emotional damages;

   j.  Counsel fees and costs;

   k.  Punitive damages.

   l.  Interest

,

m.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT 6
## VIOLATION OF 940 MASS. CODE REG. 3.17

290.  The Plaintiff repeats and re-alleges ¶¶ 1-289 above and incorporates them herein by reference.

291.  The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

292.  The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

293.  The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq.* and discriminated and retaliated against Munoz by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

294.  The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 186.

295.  The Defendants violated 940 Code Mass. Reg. 3.17 by violating Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186 and 42 U.S.C. § 3604, *et seq.*

296.  As a direct legal result of those violations of Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186 and 42 U.S.C. § 3604, *et seq.*, the Plaintiff sustained multiple damages as outlined *supra*.

297.  WHEREFORE, the Plaintiff prays this Honorable Court will order:

a.  Judgment for the Plaintiff on Count 7;

,

b.  An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

c.  Annual anti-discrimination training for all Defendants;

d.  Allowance of her parking accommodation;

e.  Allowance of her lawn cross;

f.  An injunction barring the Defendants from violating Mass. Gen. Laws ch. 186 in the future;

g.  Free rent;

h.  Triple damages;

i.  Emotional damages;

j.  Counsel fees and costs;

k.  Punitive damages.

l.  Interest

m.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT 7
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

298.  The Plaintiff repeats and re-alleges ¶¶ 1-297 above and incorporates them herein by reference.

299.  The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

300.  The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

301.  The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq.* and discriminated and retaliated against Munoz) by rescinding the Plaintiff's parking accommodation, by raising her rent, by

,

pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

302. In negligently failing to comply with Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186 and 42 U.S.C. § 3604, *et seq.*, the Defendants negligently caused foreseeable physical harm to the Plaintiff and severe emotional distress she would not have otherwise endured.

303. As a direct legal result of those violations of Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186, 42 U.S.C. § 3604, *et seq.*, and 940 Code Mass. Reg. 3.17, the Plaintiff sustained multiple damages as outlined *supra* just as any reasonable person would have suffered.

304. WHEREFORE, the Plaintiff prays this Honorable Court will order:

   a. Judgment for the Plaintiff on Count 8;

   b. An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

   c. Annual anti-discrimination training for all Defendants;

   d. Allowance of her parking accommodation;

   e. Allowance of her lawn cross;

   f. Free rent;

   g. Triple damages;

   h. Emotional damages;

   i. Counsel fees and costs;

   j. Punitive damages.

,

   k.  Interest

   l.  Such additional orders as this Honorable Court may deem fair and just.

**COUNT 8**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

305. The Plaintiff repeats and re-alleges ¶¶ 1-304 above and incorporates them herein by reference.

306. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

307. The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

308. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq.* and discriminated and retaliated against Munoz) by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

309. In recklessly and intentionally failing to comply with Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186 and 42 U.S.C. § 3604, *et seq.*, the Defendants intentionally caused physical harm to the Plaintiff and severe emotional distress she would not have otherwise endured.

310. The Defendants' reckless and intentional failure to allow the Plaintiff to continue her disability accommodations was extreme and outrageous.

311. As a direct legal result of those violations of Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186, 42 U.S.C. § 3604, *et seq.*, and 940 Code Mass. Reg. 3.17, and the severe

,

emotional distress, the Plaintiff sustained multiple damages as outlined *supra* just as any reasonable person would have suffered.

312. WHEREFORE, the Plaintiff prays this Honorable Court will order:

    a.  Judgment for the Plaintiff on Count 9;

    b.  An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

    c.  Annual anti-discrimination training for all Defendants;

    d.  Allowance of her parking accommodation;

    e.  Allowance of her lawn cross;

    f.  Free rent;

    g.  Triple damages;

    h.  Emotional damages;

    i.  Counsel fees and costs;

    j.  Punitive damages.

    k.  Interest

    l.  Such additional orders as this Honorable Court may deem fair and just.

**COUNT 9**
**VIOLATION OF MASS. GEN. LAWS CH. 186**

313. The Plaintiff repeats and re-alleges ¶¶ 1-312 above and incorporates them herein by reference.

314. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

315. The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

,

316. The Defendants failed to adhere to the requirements of Mass. Gen. Laws ch. 186, § 15B as well as other mandates of Mass. Gen. Laws ch. 186.

317. The Defendants violated multiple mandates and requirements of Mass. Gen. Laws ch. 186, § 15B as well as other sections of Mass. Gen. Laws ch. 186.

318. As a direct legal result of those violations of Mass. Gen. Laws ch. 186, § 15B, as well as other sections of Mass. Gen. Laws ch. 186, the Plaintiff sustained multiple damages as outlined *supra*.

319. WHEREFORE, the Plaintiff prays this Honorable Court will order:

    a.  Judgment for the Plaintiff on Count 10;

    b.  An injunction barring the Defendants from violating Mass. Gen. Laws ch. 186 in the future;

    c.  Free rent;

    d.  Triple damages;

    e.  Emotional damages;

    f.  Counsel fees and costs;

    g.  Punitive damages.

    h.  Interest

    i.  Such additional orders as this Honorable Court may deem fair and just.

## COUNT 10
## CIVIL CONSPIRACY

320. The Plaintiff repeats and re-alleges ¶¶ 1-319 above and incorporates them herein by reference.

321. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

,

322. The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

323. The Forest Street and the Perrotta Defendants worked together and hired APM, LLC, Webster and Nataloni as their agents so that they could conspire with them to continue the disability discrimination and retaliation

324. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B, Mass. Gen Laws ch. 186, 940 Code Mass. Reg. 3.17, or 42 U.S.C. § 3604, *et seq*.

325. In failing to adhere to the mandates of Mass. Gen. Laws ch. 151B, Mass. Gen Laws ch. 186, 940 Code Mass. Reg. 3.17, or 42 U.S.C. § 3604, *et seq*. the Defendants failed to adhere to the mandates of Mass. Gen. Laws ch. 93A.

326. As a direct legal result of those violations of Mass. Gen. Laws ch. 151B, Mass. Gen Laws ch. 186, 940 Code Mass. Reg. 3.17, or 42 U.S.C. § 3604, *et seq,* the Plaintiff sustained multiple damages as outlined *supra*.

327. WHEREFORE, the Plaintiff prays this Honorable Court will order:

    a.  Judgment for the Plaintiff on Count 11;

    b.  An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

    c.  Annual anti-discrimination training for all Defendants;

    d.  Allowance of her parking accommodation;

    e.  Allowance of her lawn cross;

    f.  An injunction barring the Defendants from violating Mass. Gen. Laws ch. 186 in the future;

    g.  Free rent;

,

    h.  Triple damages;

    i.  Emotional damages;

    j.  Counsel fees and costs;

    k.  Punitive damages.

    l.  Interest

    m.  Such additional orders as this Honorable Court may deem fair and just..

## COUNT 11
## NEGLIGENCE

328. The Plaintiff repeats and re-alleges ¶¶ 1-327 above and incorporates them herein by reference.

329. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

330. The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

331. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B or 42 U.S.C. § 3604, *et seq.* and discriminated and retaliated against Munoz) by rescinding the Plaintiff's parking accommodation, by raising her rent, by pointing cameras into her bedroom and living room, by refusing to cooperate with RAFT, by making the living conditions dangerous to force Munoz to leave the Apartment, by interfering with Munoz' ESA and by telling Munoz she must remove her religious cross from the lawn.

332. In negligently failing to comply with Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186 and 42 U.S.C. § 3604, *et seq.*, the Defendants negligently caused foreseeable harm to the Plaintiff she would not have otherwise endured.

,

333. As a direct legal result of those violations of Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186, 42 U.S.C. § 3604, *et seq*., and 940 Code Mass. Reg. 3.17, the Plaintiff sustained multiple damages as outlined *supra* just as any reasonable person would have suffered.

334. WHEREFORE, the Plaintiff prays this Honorable Court will order:

   m. Judgment for the Plaintiff on Count 8;

   n. An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

   o. Annual anti-discrimination training for all Defendants;

   p. Allowance of her parking accommodation;

   q. Allowance of her lawn cross;

   r. Free rent;

   s. Triple damages;

   t. Emotional damages;

   u. Counsel fees and costs;

   v. Punitive damages.

   w. Interest

   x. Such additional orders as this Honorable Court may deem fair and just.

### COUNT 12
### VIOLATION OF MASS. GEN. LAWS CH. 93A

335. The Plaintiff repeats and re-alleges ¶¶ 1-334 above and incorporates them herein by reference.

336. The Plaintiff rented an apartment expecting that the landlord would abide by all Massachusetts and federal laws.

,

337. The Plaintiff paid rent her rent as her part of the contract and abided by the other Lease provisions.

338. The Defendants failed to abide by the requirements and proscriptions of Mass. Gen. Laws ch. 151B, Mass. Gen Laws ch. 186, 940 Code Mass. Reg. 3.17, or 42 U.S.C. § 3604, *et seq*.

339. In failing to adhere to the mandates of Mass. Gen. Laws ch. 151B, Mass. Gen Laws ch. 186, 940 Code Mass. Reg. 3.17, or 42 U.S.C. § 3604, *et seq*. the Defendants failed to adhere to the mandates of Mass. Gen. Laws ch. 93A.

340. As a direct legal result of those violations of Mass. Gen. Laws ch. 151B, Mass. Gen Laws ch. 186, Mass. Gen. Laws ch. 93A, 940 Code Mass. Reg. 3.17, or 42 U.S.C. § 3604, *et seq,* the Plaintiff sustained multiple damages as outlined *supra*.

341. WHEREFORE, the Plaintiff prays this Honorable Court will order:

   a. Judgment for the Plaintiff on Count 13;

   b. An injunction barring the Defendants from similar discriminatory and retaliatory conduct in the future;

   c. Annual anti-discrimination training for all Defendants;

   d. Allowance of her parking accommodation;

   e. Allowance of her lawn cross;

   f. An injunction barring the Defendants from violating Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 186, Mass. Gen. Laws ch. 93A or 42 U.S.C. § 3604, *et seq,* in the future;

   g. Free rent;

   h. Triple damages;

   i. Emotional damages;

,

j.  Counsel fees and costs;

k.  Punitive damages.

l.  Interest

m.  Such additional orders as this Honorable Court may deem fair and just.

### DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial on all issues so triable.

> Respectfully submitted,
> The Plaintiff,
> MARYANN MUNOZ,
> By her attorneys
>
> */s/ Walter H. Jacobs*
> _____
> WALTER H. JACOBS
> BBO # 672106
> wjacobslaw@gmail.com
>
> */s/ Alexandria A. Jacobs*
> _____
> ALEXANDRIA A. JACOBS
> BBO # 682114
> ajacobslaw@gmail.com
> W. Jacobs and Associates at Law, L.L.C.
> 795 Turnpike Road
> North Andover, Massachusetts 01845

Dated: July 25, 2022                          978-688-0900

### CERTIFICATE OF SERVICE

I hereby certify, in compliance with Local Rule 5.2(b), that this document(s) filed through the EFC system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non- registered participants on this date.

> */s/ Walter H. Jacobs*
> _____

Dated: July 25, 2022                          WALTER H. JACOBS